UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SHAMEL WRIGHT,

                                        Plaintiff,

v.

                                                              9:14-CV-01041

                                                                    (DNH/TWD)

ROWLAND POTTER, MICHAEL BARKMAN,
JAMES THOMSEN, C.O. JOHN DOE #1, C.O.
JOHN DOE #2 AND SGT. JOHN DOE,

                                        Defendants.
_____

APPEARANCES:                            OF COUNSEL:

SHAMEL WRIGHT
Plaintiff *pro se*
346 Furman Street
1st Floor
Schenectady, NY 12304

HON. ERIC T. SCHNEIDERMAN              RYAN E. MANLEY, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge


<u>**REPORT-RECOMMENDATION AND ORDER**</u>

        This matter was referred to the undersigned for report and recommendation by the

Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Northern District of New York Local Rule 72.3.  *Pro se* Plaintiff Shamel Wright, a former

inmate in the custody of the New York State Department of Correction and Community Supervision ("DOCCS"), has commenced this action pursuant to 42 U.S.C. § 1983 alleging violations of his civil rights while confined at Greene Correctional Facility ("Greene").

Specifically, Plaintiff claims that on August 30, 2013, Defendants Sergeant Rowland Potter ("Potter"), Sergeant Michael Barkman ("Barkman"), Sergeant John Doe ("Sergeant Doe"), Correction Officer John Doe #1 ("Officer Doe #1"), and Correction Officer John Doe #2 ("Officer Doe #2") subjected him to excessive force as well as failed to intervene or to protect Plaintiff. (*See generally* Dkt. No. 1.) Plaintiff also alleges an Eighth Amendment violation arising out of medical indifference against Defendant James Thomsen ("Thomsen"). *Id*. Currently pending before the Court is Defendant Thomsen's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) Plaintiff has not opposed the motion. For the following reasons, I recommend that the Court grant Defendant Thomsen's motion for summary judgment.

## I. BACKGROUND AND PROCEDURAL HISTORY

The following facts are set forth as alleged in Plaintiff's verified complaint.[1] On August 30, 2013, at approximately 8:55pm, Plaintiff was restrained and transported by Officer Doe #1 and Potter following a physical altercation between Plaintiff and another inmate. (Dkt. No. 1 at ¶ 18.) Plaintiff was initially placed in a holding room before he was moved to an office. *Id*. at ¶ 21. Potter ordered Plaintiff to sit in a metal folding chair situated to the left of the door. *Id*.

---

[1] A verified complaint, such as Plaintiff's (Dkt. No. 1), is to be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit…and therefore will be considered in determining whether material issues of fact exist . . . . ") (citations omitted).

Barkman asked Plaintiff several questions about the cause of the physical altercation with the other inmate. *Id*. at ¶ 23. When Plaintiff's answers proved unsatisfactory, Officer Doe #2 pulled the chair from underneath him, resulting in Plaintiff falling to the ground. *Id*. at 25. Officer Doe #2 then proceeded to hit Plaintiff over the head with the metal chair. *Id*. Plaintiff began bleeding immediately. *Id*. at ¶ 26. Plaintiff then demanded that pictures of his injury be taken and that the entire incident be reported. *Id*. at ¶ 28. Plaintiff also requested that he be sent to an outside hospital. *Id*. According to Plaintiff, Barkman, Potter, Sergeant Doe, and Officer Doe #1 were present and observed the assault. *Id*. at ¶¶ 21-26.

At approximately 9:30pm, Plaintiff was brought to the nurse's office by Barkman and non-party Correction Officer Castillo ("Castillo").[2] *Id*. at ¶ 28. Defendant Thomsen attempted to wipe the blood off of Plaintiff's head and chest. *Id*. at ¶ 29. Plaintiff expressed his desire to have photographs taken of the injury before it was cleaned. *Id*. Barkman refused to photograph the injury sustained by Plaintiff. *Id*. Potter came into the room and asked Plaintiff if he was refusing medical treatment. *Id*. Plaintiff informed Potter that he was not refusing medical care but that he wished for pictures to be taken before the examination. *Id.* Potter informed Plaintiff that he was refusing medical care and Potter, Defendant Thomsen, and Castillo signed a refusal form stating that Plaintiff had refused medical care. *Id*.

Plaintiff was taken to a cell and approximately forty-five minutes later, Potter returned to Plaintiff's cell with two nurses who examined and cleaned Plaintiff's forehead. *Id*. at ¶ 30.

---

[2] Castillo was originally named as a defendant in Plaintiff's complaint, however he was subsequently terminated from the suit upon initial review. (Dkt. No. 11 at 10-16.)

Plaintiff was later taken to Albany Medical Center for treatment where he received two staples. *Id*. at ¶ 34.

Plaintiff alleges that Defendant Thomsen exercised deliberate indifference by failing to provide adequate medical care in violation of his Eighth Amendment rights. (Dkt. No. 1 at ¶ 54.) Specifically, Plaintiff alleges that Defendant Thomsen signed a form falsely indicating that Plaintiff had refused medical care for a laceration on Plaintiff's forehead instead of properly treating the injury. *Id*.

On September 12, 2013, Plaintiff filed an Inmate Grievance Complaint alleging that he had been struck on the head with a chair wielded by Officer Doe #2 on August 30, 2013. (Dkt. No. 30-8.) Plaintiff indicated that Potter, Barkman, and Officer Doe #1 were present for the alleged altercation. *Id*. Plaintiff titled his grievance "CO Assaulted Me With Chair." *Id*. Plaintiff did not fill out any other grievances associated with the incident. (Dkt. No. 30-5 at ¶¶10-18.)

The grievance was filed with Greene's inmate grievance resolution committee ("IGRC") office on September 12, 2013. (Dkt. No. 1 at ¶ 41.) On October 15, 2013, Plaintiff's grievance was denied. *Id*. at ¶ 42. Plaintiff's appeal was received by the IGRC office on October 21, 2013. *Id*. at ¶ 22. Plaintiff appealed the IGRC decision through the Central Office Review Committee ("CORC") and the appeal was received by CORC on November 15, 2013. *Id*. at ¶ 44. On March 26, 2014, CORC subsequently denied the appeal citing insufficient evidence to substantiate Plaintiff's claim. *Id*. at ¶ 45; *see also* Dkt. No. 1 at 12.[3]

---

[3] Citations to page numbers in Court documents refer to the page numbers assigned by the Court's electronic filing system.

Plaintiff commenced this action on August 22, 2014. *Id.* Defendant Thomsen now moves for summary judgment on the grounds that Plaintiff failed to properly exhaust his available administrative remedies with respect to his medical indifference claim. (Dkt. No. 30-2 at 3-6.) In the alternative, Defendant moves for summary judgement on the merits and also argues that he is entitled to qualified immunity. (Dkt. No. 30-2 at 3-6.) Plaintiff has not opposed the motion. The Court addresses only the exhaustion argument, as it is dispositive.

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit and "therefore will be considered in determining whether material issues of fact exist[.]" *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original). To defeat summary judgment, "nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to formal pleadings drafted by lawyers." *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haynes v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second

Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). The court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, this does not mean that a *pro se* litigant is excused from following the procedural formalities of summary judgment, *Govan*, 289 F. Supp. 2d at 295, and "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999)[4] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)). Moreover, the latitude accorded a *pro se* litigant "does not relieve him of the obligation to respond to a motion for summary judgment with sufficient admissible evidence." *Hamlett v. Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (citing *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)).

When a plaintiff fails to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1) determine what material facts, if any, are undisputed in the record; and (2) assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the defendants. *See*

---

[4] The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76, 76 (2d Cir. 2009) (per curium).

*Id.*; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001); L.R. 7.1(b)(3).

Where a plaintiff has failed to properly respond to a defendant's Statement of Material Facts (its "Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se*, has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *See* L.R. 7.1(a)(3); *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *Champion*, 76 F.3d at 486.

Plaintiff was sent a notice of motion (Dkt. No. 30) by Defendant's counsel as well as an attached notification of the consequences of failing to respond to a summary judgment motion. (Dkt. No. 30-1.)  Plaintiff failed to submit any papers in opposition to summary judgment as noted above.

## III.    ANALYSIS

Defendant Thomsen argues that Plaintiff's Eighth Amendment claim of medical indifference should be dismissed because Plaintiff failed to properly exhaust his available administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"), prior to filing this federal civil rights action.  (Dkt. No. 30-2 at 3-6.)  Defendant is correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In New York state prisons, DOCCS has a well-established three-step inmate grievance program. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013).

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*id*. at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. at §701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id*. at § 701.5(c)(3)(ii).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. at § 701.5(d)(1)(I). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id*. at § 701.5(d)(3)(ii).

If a prisoner has failed to properly follow each of the applicable steps and complete the process prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93.

Plaintiff filed a single grievance concerning the August 30, 2013, chair incident. (Dkt. No. 30-5 at ¶¶ 10-18.) CORC issued its decision on March 26, 2013. (Dkt. No. 1 at 12.) However, the grievance at no point mentioned Defendant Thomsen or medical personnel at Greene, nor did the grievance mention receiving inadequate medical care after the incident. (*See* Dkt. No. 30-8.)

Although it is appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally. *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006). Consistent with this purpose, a prisoner must allege facts sufficient to alert corrections officials "to the nature of the claim," and "provide enough information about the conduct" at issue "to allow prison officials to take appropriate responsive measures." *Singh v. Lynch*, 460 F. App'x 45, 47 (2d Cir. 2012) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)). Even though "a New York state prisoner is not required to name responsible parties in a grievance in order to exhaust administrative remedies," the inmate is required to "provide a specific description of the problem." *Espinal v. Goord*, 558 F.3d 119, 126-27 (2d Cir. 2009) (citing NYCRR § 701.7(a)(1)(i)).

While Plaintiff is not required to specifically name Defendant Thomsen in his grievance, Plaintiff's failure to specifically describe *any* problem in his grievance concerning medical treatment after the incident did not give the facility enough information to investigate allegations against Defendant Thomsen. *See Hemby v. Ferrari*, No. 9:13–CV–613, 2014 WL 1584160, at *26 (N.D.N.Y. Apr. 21, 2014) (holding that Plaintiff had failed to exhaust medical indifference claim alleging denial of medication for an ulcer where Plaintiff had filed a grievance only alleging improper wound care of the ulcer.)

Plaintiff filed a single grievance concerning the August 30, 2013, chair incident. (Dkt. No. 30-5 at ¶¶ 10-18.) In the grievance, Plaintiff stated that he was hit in the head with a chair while handcuffed and subsequently taken to Albany Medical Center where he received staples before being released. (Dkt. No. 30-8.) Plaintiff described the assault as occurring in a sergeant's office with three sergeants and two correction officers present. *Id.* Plaintiff admitted he did not know the names of the correction officers but would be able to identify them in a picture. *Id.* Plaintiff did identify Sergeant Barkman and Sergeant Potter in the grievance. *Id.* Yet, in that same grievance, Plaintiff failed to mention Defendant Thomsen by name or profession, failed to reference any medical personnel, and failed to reference receiving inadequate medical treatment. *Id.* Because Plaintiff's grievance contained no mention of inadequate medical care after the incident, Plaintiff's Eighth Amendment medical indifference claim against Defendant Thomsen has not been exhausted.

Plaintiff's failure to exhaust, however, does not end the review. For more than ten years, courts in this district have been guided by the Second Circuit's decision in *Hemphill v. New*

*York*. 380 F.3d 680, 686 (2d Cir. 2004). Under *Hemphill*, the Second Circuit established a

three-part inquiry to determine whether, *inter alia*, a plaintiff's failure to exhaust available

administrative remedies could nevertheless be justified by "special circumstances." *Id*.[5]

However, on June 6, 2016, the Supreme Court rejected the "special circumstances"

exception applied by many circuits, and held that "[c]ourts may not engraft an unwritten 'special

circumstance' onto the PLRA's exhaustion requirement." *Ross v. Blake*, 578 U.S. --- (2016)

*available at* 2016 WL 3128839, at *11 (June 6, 2016). In *Ross*, the question before the Court

was whether there is a "special circumstances" exception under the PLRA when the inmate

erroneously believed that he had satisfied the exhaustion requirement. 2016 WL 3128839, at *3.

In an opinion by Justice Elena Kagan, the Supreme Court held that there is no such exception:

> The [PLRA] mandates that an inmate exhaust "such administrative
> remedies as are available" before bringing suit to challenge prison
> conditions. The court below adopted an unwritten "special
> circumstances" exception to that provision, permitting some
> prisoners to pursue litigation even when they have failed to exhaust
> available administrative remedies. Today, we reject that
> freewheeling approach to exhaustion as inconsistent with the
> PLRA.

*Id*. (internal citation omitted).

The Supreme Court's rejection of the "special circumstances" exception, however, still

does not end a court's review "because the PLRA contains its own, textual exception to

mandatory exhaustion." *Id*. at *7. Under the PLRA, "the exhaustion requirement hinges on the

'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies,

_____

[5] Generally, the "special circumstances" exception was applied where a prisoner has
been threatened with physical retaliation for exhausting administrative remedies or where the
prisoner reasonably misinterpreted the statutory requirements of the appeals process. *Giano v.
Goord*, 380 F.3d 670, 676 (2d Cir. 2004).

but need not exhaust unavailable ones." *Id.* Thus, courts are still tasked with determining whether or not a prisoner's administrative remedies are, in fact "available."

To guide courts in this analysis, the Supreme Court identified "three kinds of circumstances" in which an administrative remedy, "although officially on the books," is not "available." *Id.*

First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* at *8. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

In light of the above, the Court must now consider whether Plaintiff exhausted his *available* administrative remedies regarding his Eighth Amendment medical indifference claim before commencing this action.

Here, Plaintiff has not claimed that the administrative procedure was unavailable to him. To the contrary, Plaintiff utilized the administrative procedure to file a grievance concerning the August 30, 2013, incident.[6] (Dkt. No. 30-5 at ¶¶14-18.) Yet, Plaintiff still failed to file any grievance alleging inadequate medical care or calling into question his treatment at the hands of

---

[6] While Plaintiff testified during his deposition that one of the unidentified correction officers "threatened" him at a later date, Plaintiff does not allege that the threat prevented him from filing any additional grievances. In fact, Plaintiff subsequently filed an additional grievance based on that alleged threat. (Dkt. No. 30-5 at ¶¶ 10-20.)

Greene's medical staff. Thus, Plaintiff's Eighth Amendment medical indifference claim against Defendant Thomsen is not exhausted. Accordingly, the Court recommends that said Defendant's motion for summary judgment (Dkt. No. 30) be granted.

Since the Court is recommending that summary judgement be granted for failure to exhaust administrative remedies, the Court need not reach Defendant Thomsen's remaining arguments.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that the Court **GRANT** Defendant James Thomsen's motion for summary judgment (Dkt. No. 30); and it is further

**RECOMMENDED** that the Court dismiss all claims against Defendant James Thomsen and terminate him from this action; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: June 28, 2016
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

2014 WL 1584160
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terrence HEMBY, Plaintiff,

v.

Dr. FERRARI, Clinton County Correctional Facility;
Dr. Johnson, Clinton County Correctional Facility;
Nurse Badger, Clinton County Correctional Facility;
Damour, Nurse; and Lasway, Nurse, Defendants. [1]

No. 9:13–CV–613.
|
Signed April 18, 2014.
|
Filed April 21, 2014.

**Attorneys and Law Firms**

Terrence Hemby, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Laura A. Sprague, Esq., Assistant
Attorney General, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* action pursuant to 42 U.S.C. § 1983
was referred to the Hon. Christian F. Hummel, United
States Magistrate Judge, for a Report–Recommendation
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report–Recommendation, dated March 21, 2014,
recommended that Defendant's motion for summary
judgment (Dkt.# 34) be granted without prejudice because
Plaintiff failed to exhaust his administrative remedies
before filing suit.

No objections to the Report–Recommendation have
been filed. After examining the record, this Court
has determined that the Report–Recommendation is
not subject to attack for plain error or manifest
injustice. Accordingly, this Court adopts the Report–
Recommendation for the reasons stated therein.

For the foregoing reasons, the Court ADOPTS the Report
and Recommendation and GRANTS the Defendants'
Motion for Summary Judgment (Dkt.# 34) without
prejudice.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, United States Magistrate
Judge.

Plaintiff *pro se* Terrence Hemby ("Hemby"), an inmate
currently in the custody of the New York Department
of Corrections and Community Supervision ("DOCCS"),
brings this action pursuant to 42 U.S.C. § 1983 alleging
that defendants, five DOCCS medical personnel, violated
his constitutional rights under the Eighth and Fourteenth
Amendments. *See* Am. Compl. (Dkt. No. 25) ¶¶ 30–
51. Presently pending is defendants' motion for summary
judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 34.
Hemby opposes the motion. Dkt. No. 36. Defendants
replied to Hemby's opposition. Dkt. No. 37. For the
following reasons, it is recommended that defendants'
motion be granted.

**I. Background**

The facts related to the underlying substantive claims,
which began in April 2012, are as follows. Am. Compl.
¶ 12. At all relevant times, Hemby was an inmate at
Clinton County Correctional Facility ("Clinton"). *Id.* ¶¶
3–5. Hemby developed a leg ulcer, a condition which
he had previously suffered. *Id.* ¶¶ 12, 21. Hemby asserts
defendants, five DOCCS employees in various medical
positions, provided him with inadequate medical care, and
retaliated against him after he filed grievances related to
the care being provided. *See generally id.*

According to the allegations, this was accomplished by
defendant Dr. Ferrari when he failed to conduct follow-up
visits to examine the wound, delayed ordering surgery for
the leg ulcer, and failing to provide necessary medication
to prevent unnecessary pain. Am. Compl. ¶¶ 13–14, 20–
22, 25, 33, 35, 39–40, 45, 51. Hemby alleges that defendant
Dr. Johnson, Chief of Clinton's Medical Department,
permitted the staff's behavior to continue even after being

notified by letters, failed to investigate the inadequate care received, and refused to respond to those sent by Hemby. *Id.* ¶¶ 14, 23, 25, 35, 37, 42, 47, 51. Defendants Nurses Badger and Lasway are alleged to have disregarded Hemby's health by failing to check on the leg wound with satisfactory frequency and improperly changing the wound dressing. *Id.* ¶¶ 13–14, 17–18, 21–22, 25–26, 34–36, 38, 41, 43, 46, 48, 51. Defendant Nurse Damour is alleged to have improperly changed the wound dressing and ignored Hemby's request for emergency medical treatment when he had experienced great pain. *Id.* ¶¶ 14, 25, 27–28, 35, 44, 49, 51.

**\*2** At various times Hemby filed grievances in accordance with the Inmate Grievance Program ("IGP") procedure. [2] Am. Compl. ¶¶ 15–16, 29; Dkt. Nos. 34–3 ¶ 3, 34–4, 34–5 ¶ 6, 36 ¶ 2. During the relevant time period, Hemby alleges he filed at least five grievances, all of which were related to his medical treatment. Am. Compl. ¶¶ 15–16, 29; Dkt. Nos. 34–3 ¶ 3; 34–4; 34–5 ¶ 6; 36 ¶ 2. After receiving initial determinations, Hemby appealed each denial to Central Office Review Committee ("CORC"). *See* Brousseau Decl. (Dkt. No. 34–3) ¶ 4 (attesting that as of October 8, 2013, Hemby's 2013 grievances are pending appeal before CORC); *see generally* Dkt. No. 34–4. On September 25, 2013, CORC decided on one appeal. Hale Decl. (Dkt. No. 34–5) ¶ 6. However, as of October 8, 2013, that CORC decision was not yet sent to the Inmate Grievance Supervisor at Clinton. *Id.* As of the filing of the amended complaint, all five grievances were pending appeal and had not reached their conclusion. [3] Brousseau Decl. ¶ 4; Hale Decl. ¶ 6; *see generally* Dkt. No. 34–4.

## II. Discussion

Hemby contends that his Eighth and Fourteenth Amendment rights were violated when each defendant individually: (1) exhibited deliberate indifference; (2) subjected Hemby to cruel and unusual punishment; (3) violated Hemby's due process rights; and (4) retaliated against Hemby in response to the filing of grievances. *See generally* Am. Compl. Defendants contend that Hemby failed to exhaust his administrative remedies. *See generally* Dkt. No. 34–6. In his response to the summary judgement motion, Hemby asserts that he did not have to exhaust before the filing of the instant action. Dkt. No. 36 at 1.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

**\*3** When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not

exempt a party from compliance with relevant rules of procedural and substantive law ....“

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) (“On occasions too numerous to count, we have reminded district courts that ‘when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.’ “ (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

**B. Exhaustion**

Under the Prison Litigation Reform Act (“PLRA”), 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *see also Woodford v. Ngo,* 548 U.S. 81, 83, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). This exhaustion requirement applies to all prison condition cases. *Porter,* 534 U.S. at 532. “[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement.” *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate. *Porter,* 534 U.S. at 524.

Exhaustion for an inmate in DOCCS custody is generally achieved through IGP. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701.1, et seq. Allegations of staff harassment are subject to an expedited procedure whereupon the complaint is first reviewed by the Superintendent and only if it is not a bona fide claim will it be returned to the IGP for normal processing. N.Y. COMP.CODES. R & REGS. tit. 7, § 701.8. Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit. *Torres v. Carry,* 672 F.Supp.2d 338, 344 (S.D.N.Y.2009); *see also* N.Y. COMP.CODES R. & REGS. tit. 7 § 701.5(d)(2)(ii) (“The CORC shall review each appeal, render a decision on the grievance,

and transmit its decision ... within 30 calendar days”). Disagreement with the superintendent's decision in the expedited review also requires an appeal to CORC. N .Y. COMP.CODES. R & REGS. tit. 7, § 701.8(g)-(h); *see also Espinal v. Goord,* 588 F.3d 119, 125 (2d Cir.2009) (explaining IGP and the expedited procedure for harassment claims and its appeal mechanism through CORC). Exhaustion must precede filing a lawsuit. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (“Subsequent exhaustion after suit is filed therefore is insufficient.”), *abrogated in part on other grounds by Porter,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12.

**\*4** While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that “certain caveats apply.” *Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)). The failure to exhaust may be excused in limited circumstances.

> In determining whether such an exception is applicable, a district court must apply a three-part test: First, the court must determine whether administrative remedies in fact were available to the prisoner. Second, if such remedies were available, the court must determine whether the defendants' own actions inhibited the inmate's exhaustion of administrative remedies, thereby requiring that one or more of them be equitably estopped from raising the failure to exhaust as a defense. Finally, if administrative remedies were available and the defendants are not estopped, the court must determine whether any special circumstances justify the prisoner's failure to comply with administrative procedural requirements.

*Gayle v. Benware,* 716 F.Supp.2d 293, 298 (S.D.N.Y.2010) (internal citations omitted); *see generally Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (articulating above test as the appropriate method for excusing failure to exhaust given the present state of all Second Circuit opinions). “Unavailability of administrative remedies ... is an objective [test]: that is, would a similarly situated

individual of ordinary firmness have deemed them unavailable." *Kasiem v. Switz,* 756 F.Supp.2d 570, 576–77 (S.D.N.Y.2010) (internal quotation marks and citations omitted). Estoppel occurs when "an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible ... [as evidenced by] prison officials' threats, beatings, ... denials of grievance forms, or by other misconduct deterring [the inmate] from fulfilling the requisite procedure." *Id.* at 577 (internal quotation marks and citations omitted). If an inmate claims estoppel and continues to file complaints and grievances, the exception is inapplicable. *Id.* Special circumstances exist when an inmate's failure to comply can be justified. *Id.* (citations omitted). Justification is found "by looking at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004) (citations omitted).

When considering whether special circumstances exist, the inmate's actions must have given prison officials sufficient information to put them on notice of the complaints, despite the inmate's failure to utilize formal grievance procedures, as well as give the prison time to evaluate the claims. *Macias v. Zenk,* 495 F.3d 37, 43–44 (2d Cir.2007). Thus, exhaustion requires satisfaction of both a substantive prong, requiring prison officials to be placed on notice of the complaint, and a procedural prong, expecting inmates to present their grievances within a formerly prescribed framework permitting both investigation and remediation. *Id.*

**\*5** In this case, Hemby's complaint must be dismissed without prejudice for failure to comply with exhaustion requirements. Record evidence supports the conclusion that all five of the grievances associated with the events at issue are still being appealed. [4] Dkt. Nos. 34–1; 34–3 ¶ 4; 34–5 ¶ 6; *see generally* Dkt. No. 34–4. Hemby makes no remarks addressing the status of his grievances and absent from the record is any indication that the grievances have exhausted. Hemby only offers a conclusory and unsupported statement that this Court excused the exhaustion requirement at the time he initially filed his complaint. Dkt. No. 36 at 1. No record evidence supports any such statement. Thus, there is sufficient evidence to prove that Hemby has failed to exhaust his administrative remedies for purposes of this federal action. *Neal,* 267 F.3d at 122.

Even in light of the special solicitude afforded to pro se plaintiffs, Hemby has failed to establish an excuse to counter defendant's exhaustion defense. First, Hemby does not make any allegations that administrative remedies were unavailable. To the contrary, evidence suggests that upon filing the grievances, Hemby believed such remedies to exist. *See* Dkt. No. 34–4 at 2, 9–10, 13 (grievances in which Hemby request specific actions to be taken to resolve his complaints). Hemby's requested remedies included a review of his current treatment, the provision of proper medical care and supplies, and a new medical professional to provide such care. *Id.* at 2, 9–10, 13. Thus, a similarly situated person of ordinary firmness would not have deemed his administrative remedies to be unavailable. *Kasiem,* 756 F.Supp.2d at 576–77.

Second, despite Hemby's claims that he was transferred in an attempt to prevent him from fulfilling exhaustion requirements and non-party IGP Supervisor Trousseau interfered with Hemby's access to the IGP, defendants are not estopped from asserting an exhaustion defense. Am. Compl. ¶¶ 15–16, 29, 50, 53. During the entirety of the time frame in question, Hemby was an inmate at Clinton. Irwin Decl. (Dkt. No. 37–1) ¶ 3; Dkt. No. 37–1 at 3. Hemby asserts that the hearing for grievance CLA–6469–13 was delayed beyond the time specified in the DOCCS policy. Am. Compl. ¶¶ 15–16, 29, 50, 53; Dkt. Nos. 34–4 at 11, 36 ¶¶ 1, 8. However, even assuming the IGP failed to timely respond, Hemby was to appeal to the next level. N.Y. COMP.CODES. R & REGS. tit. 7, § 701.6(g)(2) ("matters not decided within the time limits may be appealed to the next step"). Hemby does not allege, nor does the record reflect the contrary, that he carried out this step. Further, the evidence supports, and Hemby does not refute, that all of Hemby's grievances proceeded in the IGP process and were pending appeal at the time the instant motion was filed. Dkt. Nos. 34–1, 34–3 ¶ 4, 34–4, 34–5 ¶ 6. Moreover, Hemby continuously filed grievances, even after he filed his initial complaint in this action. Compl. (Dkt. No. 1); Dkt. Nos. 34–1, 34–4 at 1, 13, 18; *Kasiem,* 756 F.Supp.2d at 577. As such, Hemby cannot invoke the estoppel defense.

**\*6** Finally, no special circumstances exist that would justify a failure to exhaust. There is no evidence that Hemby was confused by IGP procedures. To the contrary, Hemby displayed intimate knowledge of the IGP, and the exhaustion requirement specifically, when he: understood the difference between writing letters to DOCCS officials

versus filing a grievance; repeatedly reflected knowledge of the exhaustion requirement and IGP procedures; stated in his grievances his intent to file a civil action at the conclusion of the IGP process; and identified in his response to the defendants' instant motion that their arguments were limited to an exhaustion defense. Am. Compl. ¶¶ 15–16, 29, 50, 53; Dkt. Nos. 34–4 at 9–10; 36 ¶¶ 1–2, 8. Therefore, Hemby's failure to comply with his exhaustion requirements is not justified by a special circumstance. *Giano,* 380 F.3d at 678.

Because Hemby failed to properly exhaust his administrative remedies before commencing this suit, and no limited circumstance exists to excuse such failure, the action must be dismissed without prejudice. *Kasiem,* 756 F.Supp.2d at 578. In the event that Hemby has fully exhausted his administrative remedies, he may refile his complaint and reinstitute his suit.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 34) be **GRANTED** and Hemby's amended complaint (Dkt. No. 25) be **DISMISSED** without prejudice.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); *see also* 28 U.S.C. § 636(b) (1); Fed R. Civ. P. 72, 6(a), 6(e).

Dated: March 21, 2014.

**All Citations**

Slip Copy, 2014 WL 1584160

Footnotes

1    By decision and order dated September 9, 2013, defendant Brousseau was dismissed from this action. Dkt. No. 26.
1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).
2    The DOCCS "[Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the [Inmate Grievance Resolution Committee ("IGRC") ]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the [Central Office Review Committee ("CORC") ] ... within four working days of receipt of the superintendent's written response." The administrative process has been exhausted at this time. *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).
3    Hemby did not acknowledge or deny that his grievances were pending at any point. However, in his response to defendants' motion, Hemby asserts that he was excused from having to exhaust by this Court. Dkt. No. 36 ¶¶ 1–2.
4    Initially, Hemby asserts he filed more than five grievances. Am. Comp. at 3. In his response Hemby, acknowledges he only filed five grievances. Dkt. No. 36 at 1.

2016 WL 3128839
Only the Westlaw citation is currently available.
Supreme Court of the United States

Michael ROSS, Petitioner

v.

Shaidon BLAKE.

No. 15–339.
|
Argued March 29, 2016.
|
Decided June 6, 2016.

**Synopsis**

**Background:** Maryland inmate brought § 1983 action against correctional officers, alleging use of excessive force. One officer moved for summary judgment on the ground that inmate failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act (PLRA). The United States District Court for the District of Maryland, Alexander Williams, Jr., J., 2012 WL 5568940, granted the motion. Inmate appealed. The United States Court of Appeals for the Fourth Circuit, Gregory, Circuit Judge, 787 F.3d 693, reversed, and certiorari was granted.

**Holdings:** The Supreme Court, Justice Kagan, held that:

[1] a court may not excuse an inmate's failure to exhaust administrative remedies prior to bringing suit under the PLRA, even to take "special" circumstances into account, abrogating *Giano v. Goord*, 380 F.3d 670, and

[2] remand was required to determine if prison grievance process was "available" to inmate.

Vacated and remanded.

Justice Thomas filed opinion concurring in part and concurring in the judgment.

Justice Breyer filed opinion concurring in part.

West Headnotes (18)

**[1]    Prisons**
　　👉 Exhaustion of Other Remedies

A prisoner need not exhaust administrative remedies prior to bringing suit under the PLRA if they are not "available." Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

5 Cases that cite this headnote

**[2]    Statutes**
　　👉 Language

Statutory interpretation begins with the text.

Cases that cite this headnote

**[3]    Prisons**
　　👉 Exhaustion of Other Remedies

A court may not excuse an inmate's failure to exhaust administrative remedies prior to bringing suit under the PLRA, even to take "special" circumstances into account; abrogating *Giano v. Goord*, 380 F.3d 670. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

2 Cases that cite this headnote

**[4]    Administrative Law and Procedure**
　　👉 Exhaustion of Administrative Remedies

Judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions.

Cases that cite this headnote

**[5]    Administrative Law and Procedure**
　　👉 Exhaustion of Administrative Remedies

Courts have a role in creating exceptions to a statutory exhaustion provision only if Congress wants them to.

Cases that cite this headnote

**[6]** **Administrative Law and Procedure**
   ☞ Exhaustion of Administrative Remedies

**Prisons**
   ☞ Exhaustion of Other Remedies

Mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

1 Cases that cite this headnote

**[7]** **Prisons**
   ☞ Exhaustion of Other Remedies

Under the PLRA, all inmates must exhaust all available remedies; exhaustion is no longer left to the discretion of the district court. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[8]** **Statutes**
   ☞ Presumptions

When Congress amends legislation, courts must presume it intends the change to have real and substantial effect.

Cases that cite this headnote

**[9]** **Statutes**
   ☞ Particular Words and Phrases

Ordinary meaning of the word "available" is capable of use for the accomplishment of a purpose, and that which is accessible or may be obtained.

Cases that cite this headnote

**[10]** **Prisons**
   ☞ Exhaustion of Other Remedies

Under the PLRA, an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of.

Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

3 Cases that cite this headnote

**[11]** **Prisons**
   ☞ Exhaustion of Other Remedies

A prison administrative procedure is unavailable for purposes of the PLRA's exhaustion requirement when, despite what regulations or guidance materials may promise, it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

2 Cases that cite this headnote

**[12]** **Prisons**
   ☞ Exhaustion of Other Remedies

Some redress for a wrong is presupposed by the PLRA's requirement of an "available" administrative remedy; where the relevant administrative procedure lacks authority to provide any relief, the inmate has nothing to exhaust. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[13]** **Prisons**
   ☞ Exhaustion of Other Remedies

A prison administrative procedure is unavailable for purposes of the PLRA's exhaustion requirement when the administrative scheme is so opaque that it becomes, practically speaking, incapable of use; in this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[14]** **Prisons**
   ☞ Exhaustion of Other Remedies

When prison administrative rules are so confusing that no reasonable prisoner can use them, then they are no longer available for purposes of the PLRA's exhaustion requirement. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

[15] **Prisons**
    🔑 Exhaustion of Other Remedies

When an administrative remedy is essentially "unknowable"—so that no ordinary prisoner can make sense of what it demands—then it is also unavailable; accordingly, exhaustion of administrative remedies under the PLRA is not required. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

1 Cases that cite this headnote

[16] **Prisons**
    🔑 Exhaustion of Other Remedies

A prison administrative procedure is unavailable for purposes of the PLRA's exhaustion requirement when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

2 Cases that cite this headnote

[17] **Federal Courts**
    🔑 Particular Cases

Remand was required to determine if prison grievance process was "available" to Maryland inmate who claimed he was assaulted by a prison guard, so as to require inmate to exhaust that process before filing suit under the PLRA, where it could not be determined if investigation of the incident by the Maryland prison system's Internal Investigative Unit (IIU) foreclosed relief through the grievance process.

Cases that cite this headnote

[18] **Prisons**
    🔑 Exhaustion of Other Remedies

Courts may not engraft an unwritten "special circumstances" exception onto the PLRA's exhaustion requirement. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

*Syllabus* [*]

**\*1** Two guards—James Madigan and petitioner Michael Ross—undertook to move respondent Shaidon Blake, a Maryland inmate, to the prison's segregation unit. During the transfer, Madigan assaulted Blake, punching him several times in the face. Blake reported the incident to a corrections officer, who referred the matter to the Maryland prison system's Internal Investigative Unit (IIU). The IIU, which has authority under state law to investigate employee misconduct, issued a report condemning Madigan's actions. Blake subsequently sued both guards under 42 U.S.C. § 1983, alleging excessive force and failure to take protective action. A jury found Madigan liable. But Ross raised (as an affirmative defense) the exhaustion requirement of the Prison Litigation Reform Act of 1995 (PLRA), which demands that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. § 1997e(a). Ross argued that Blake had filed suit without first following the prison's prescribed procedures for obtaining an administrative remedy, while Blake argued that the IIU investigation was a substitute for those procedures. The District Court sided with Ross and dismissed the suit. The Fourth Circuit reversed, holding that "special circumstances" can excuse a failure to comply with administrative procedural requirements—particularly where the inmate reasonably, even though mistakenly, believed he had sufficiently exhausted his remedies.

*Held* :

1. The Fourth Circuit's unwritten "special circumstances" exception is inconsistent with the text and history of the PLRA. Pp. —— – ——.

(a) The PLRA speaks in unambiguous terms, providing that "[n]o action shall be brought" absent exhaustion of available administrative remedies. § 1997e(a). Aside from one significant qualifier—that administrative remedies must indeed be "available"—the text suggests no limits on an inmate's obligation to exhaust. That mandatory language means a court may not excuse a failure to exhaust, even to take "special circumstances" into account. When it comes to statutory exhaustion provisions, courts have a role in creating exceptions only if Congress wants them to. So mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion. See, e.g., *McNeil v. United States,* 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21. Time and again, this Court has rejected every attempt to deviate from the PLRA's textual mandate. See *Booth v. Churner,* 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958; *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12; *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. All those precedents rebut the Fourth Circuit's "special circumstances" excuse for non-exhaustion. Pp. —— – ——.

(b) The PLRA's history further underscores the mandatory nature of its exhaustion regime. The PLRA replaced a largely discretionary exhaustion scheme, see *Nussle,* 534 U.S., at 523, 122 S.Ct. 983 removing the conditions that administrative remedies be "plain, speedy, and effective," that they satisfy federal minimum standards, and that exhaustion be "appropriate and in the interests of justice." The Court of Appeals' exception, if applied broadly, would resurrect that discretionary regime, in which a court could look to all the particulars of a case to decide whether to excuse a failure to exhaust. And if the exception were confined to cases in which a prisoner makes a reasonable mistake about the meaning of a prison's grievance procedures, it would reintroduce the requirement that the remedial process be "plain." When Congress amends legislation, courts must "presume it intends [the change] to have real and substantial effect." *Stone v. INS,* 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465. But the Court of Appeals acted as though no amendment had taken place. Pp. —— – ——.

 **\*2** 2. Blake's contention that the prison's grievance process was not in fact available to him warrants further consideration below. Pp. —— – ——.

(a) Blake's suit may yet be viable. The PLRA contains its own, textual exception to mandatory exhaustion. Under § 1997e(a), an inmate's obligation to exhaust hinges on the "availab[ility]" of administrative remedies. A prisoner is thus required to exhaust only those grievance procedures that are "capable of use" to obtain "some relief for the action complained of." *Booth,* 532 U.S., at 738, 121 S.Ct. 1819.

As relevant here, there are three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief. First, an administrative procedure is unavailable when it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use—*i.e.,* some mechanism exists to provide relief, but no ordinary prisoner can navigate it. And finally, a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation. Pp. —— – ——.

(b) The facts of this case raise questions about whether, given these principles, Blake had an "available" administrative remedy to exhaust. Ross's exhaustion defense rests on Blake's failure to seek relief through Maryland's Administrative Remedy Procedure (ARP) process, which begins with a grievance to the warden. That process is the standard method for addressing inmate complaints in the State's prisons. But Maryland separately maintains the IIU to look into charges of prison staff misconduct, and the IIU did just that here. Blake urged in the courts below that once the IIU commences such an inquiry, a prisoner cannot obtain relief through the ARP process. And in this Court, the parties have lodged additional materials relating to the interaction between the IIU and the ARP. Both sides' submissions, although scattershot and in need of further review, lend some support to Blake's account.

Blake's filings include many administrative dispositions indicating that Maryland wardens routinely dismiss ARP grievances as procedurally improper when parallel IIU investigations are pending. In addition, Blake has submitted briefs of the Maryland attorney general specifically recognizing that administrative practice. And Ross's own submissions offer some confirmation of Blake's view: Ross does not identify a single case in which

a warden considered the merits of an ARP grievance while an IIU inquiry was underway. On remand, the Fourth Circuit should perform a thorough review of such materials, and then address whether the remedies Blake did not exhaust were "available" under the legal principles set out here. Pp. ——– ——.

*3 787 F.3d 693, vacated and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C.J., and KENNEDY, GINSBURG, ALITO, and SOTOMAYOR, JJ., joined. THOMAS, J., filed an opinion concurring in part and concurring in the judgment. BREYER, J., filed an opinion concurring in part.

**Attorneys and Law Firms**

Julia Doyle Bernhardt, Baltimore, MD, for Petitioner.

Zachary D. Tripp, for the United States as amicus curiae, by special leave of the Court, supporting the petitioner.

Paul W. Hughes, Washington, DC, for Respondent.

Patrick B. Hughes, Stephanie Lane–Weber, Dorianne A. Meloy, Assistant Attorneys General, Brian E. Frosh, Attorney General of Maryland, Thiruvendran Vignarajah, Deputy Attorney General, Julia Doyle Bernhardt, Matthew J. Fader, Deputy Chiefs of Litigation, Baltimore, MD, for Petitioner.

Jeffrey J. VanDam, Mayer Brown LLP, Chicago, IL, Reginald R. Goeke, Paul W. Hughes, Michael B. Kimberly, Catherine A. Bernard, John T. Lewis, Mayer Brown LLP, Washington, DC, for Respondent.

**Opinion**

Justice KAGAN delivered the opinion of the Court.

 **[1]**  The Prison Litigation Reform Act of 1995 (PLRA) mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a). The court below adopted an unwritten "special circumstances" exception to that provision, permitting some prisoners to pursue litigation even when they have failed to exhaust available administrative remedies. Today, we reject that freewheeling approach to exhaustion as inconsistent with the PLRA. But we also underscore that statute's built-

in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not "available." The briefs and other submissions filed in this case suggest the possibility that the aggrieved inmate lacked an available administrative remedy. That issue remains open for consideration on remand, in light of the principles stated below.

I

Respondent Shaidon Blake is an inmate in a Maryland prison. On June 21, 2007, two guards—James Madigan and petitioner Michael Ross—undertook to move him from his regular cell to the facility's segregation unit. According to Blake's version of the facts, Ross handcuffed him and held him by the arm as they left the cell; Madigan followed close behind. Near the top of a flight of stairs, Madigan shoved Blake in the back. Ross told Madigan he had Blake under control, and the three continued walking. At the bottom of the stairs, Madigan pushed Blake again and then punched him four times in the face, driving his head into the wall. After a brief pause, Madigan hit Blake one last time. Ross kept hold of Blake throughout the assault. And when the blows subsided, Ross helped Madigan pin Blake to the ground until additional officers arrived.

Later that day, Blake reported the assault to a senior corrections officer. That officer thought Madigan at fault, and so referred the incident to the Maryland prison system's Internal Investigative Unit (IIU). Under state law, the IIU has authority to investigate allegations of employee misconduct, including the use of "excessive force." Code of Md. Regs., tit. 12, § 11.01.05(A)(3) (2006). After conducting a year-long inquiry into the beating, the IIU issued a final report condemning Madigan's actions, while making no findings with respect to Ross. See App. 191–195. Madigan resigned to avoid being fired.

 **\*4**  Blake subsequently sued both guards under 42 U.S.C. § 1983, alleging that Madigan had used unjustifiable force and that Ross had failed to take protective action. The claim against Madigan went to a jury, which awarded Blake a judgment of $50,000. But unlike Madigan, Ross raised the PLRA's exhaustion requirement as an affirmative defense, contending that Blake had brought suit without first following the prison's prescribed procedures for obtaining an administrative remedy. As

set out in Maryland's Inmate Handbook, that process—called, not very fancifully, the Administrative Remedy Procedure (ARP)—begins with a formal grievance to the prison's warden; it may also involve appeals to the Commissioner of Correction and then the Inmate Grievance Office (IGO). See Maryland Div. of Correction, Inmate Handbook 30–31 (2007). Blake acknowledged that he had not sought a remedy through the ARP—because, he thought, the IIU investigation served as a substitute for that otherwise standard process. The District Court rejected that explanation and dismissed the suit, holding that "the commencement of an internal investigation does not relieve prisoners from the [PLRA's] exhaustion requirement." *Blake v. Maynard,* No. 8:09–cv–2367 (D.Md., Nov. 14, 2012), App. to Pet. for Cert. 38, 2012 WL 5568940, \*5.

The Court of Appeals for the Fourth Circuit reversed in a divided decision. Stating that the PLRA's "exhaustion requirement is not absolute," the court adopted an extra-textual exception originally formulated by the Second Circuit. 787 F.3d 693, 698 (2015). Repeated the Court of Appeals: "[T]here are certain 'special circumstances' in which, though administrative remedies may have been available[,] the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Ibid.* (quoting *Giano v. Goord,* 380 F.3d 670, 676 (C.A.2 2004)). In particular, that was true when a prisoner "reasonably"—even though mistakenly—"believed that he had sufficiently exhausted his remedies." 787 F.3d, at 695. And Blake, the court concluded, fit within that exception because he reasonably thought that "the IIU's investigation removed his complaint from the typical ARP process." *Id.,* at 700. Judge Agee dissented, stating that the PLRA's mandatory exhaustion requirement is not "amenable" to "[j]udge-made exceptions." *Id.,* at 703. This Court granted certiorari. 577 U.S. ——, 136 S.Ct. 614, 193 L.Ed.2d 495 (2015).

## II

**\*5** The dispute here concerns whether the PLRA's exhaustion requirement, § 1997e(a), bars Blake's suit. Statutory text and history alike foreclose the Fourth Circuit's adoption of a "special circumstances" exception to that mandate. But Blake's suit may yet be viable. Under the PLRA, a prisoner need exhaust only "available"

administrative remedies. And Blake's contention that the prison's grievance process was not in fact available to him warrants further consideration below.

## A

**[2]** Statutory interpretation, as we always say, begins with the text, see, *e.g., Hardt v. Reliance Standard Life Ins. Co.,* 560 U.S. 242, 251, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010)—but here following that approach at once distances us from the Court of Appeals. As Blake acknowledges, that court made no attempt to ground its analysis in the PLRA's language. See 787 F.3d, at 697–698; Brief for Respondent 47–48, n. 20 (labeling the Court of Appeals' rule an "extra-textual exception to the PLRA's exhaustion requirement"). And that failure makes a difference, because the statute speaks in unambiguous terms opposite to what the Fourth Circuit said.

Section 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." As we have often observed, that language is "mandatory": An inmate "shall" bring "no action" (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 85, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); accord, *Jones v. Bock,* 549 U.S. 199, 211, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) ("There is no question that exhaustion is mandatory under the PLRA"). As later discussed, that edict contains one significant qualifier: the remedies must indeed be "available" to the prisoner. See *infra,* at —— – ——. But aside from that exception, the PLRA's text suggests no limits on an inmate's obligation to exhaust—irrespective of any "special circumstances."

**[3] [4] [5] [6]** And that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account. See *Miller v. French,* 530 U.S. 327, 337, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (explaining that "[t]he mandatory 'shall' ... normally creates an obligation impervious to judicial discretion"). No doubt, judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions. See *McKart v. United States,* 395 U.S.

185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) ("The doctrine of exhaustion of administrative remedies ... is, like most judicial doctrines, subject to numerous exceptions"). But a statutory exhaustion provision stands on a different footing. There, Congress sets the rules —and courts have a role in creating exceptions only if Congress wants them to. For that reason, mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion. See, *e.g., McNeil v. United States,* 508 U.S. 106, 111, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("We are not free to rewrite the statutory text" when Congress has strictly "bar[red] claimants from bringing suit in federal court until they have exhausted their administrative remedies"). Time and again, this Court has taken such statutes at face value—refusing to add unwritten limits onto their rigorous textual requirements. See, *e.g., id.,* at 111, 113 S.Ct. 1980; *Shalala v. Illinois Council on Long Term Care, Inc.,* 529 U.S. 1, 12–14, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000); see also 2 R. Pierce, Administrative Law Treatise § 15.3, p. 1241 (5th ed. 2010) (collecting cases).

We have taken just that approach in construing the PLRA's exhaustion provision—rejecting every attempt to deviate (as the Fourth Circuit did here) from its textual mandate. In *Booth v. Churner,* 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001), for example, the prisoner argued that exhaustion was not necessary because he wanted a type of relief that the administrative process did not provide. But § 1997e(a), we replied, made no distinctions based on the particular "forms of relief sought and offered," and that legislative judgment must control: We would not read "exceptions into statutory exhaustion requirements where Congress has provided otherwise." *Id.,* at 741, n. 6, 121 S.Ct. 1819. The next year, in *Porter v. Nussle,* 534 U.S. 516, 520, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), the Court rejected a proposal to carve out excessive-force claims (like Blake's) from the PLRA's exhaustion regime, viewing that approach too as inconsistent with the uncompromising statutory text. And most recently, in *Woodford,* we turned aside a requested exception for constitutional claims. 548 U.S., at 91, n. 2, 126 S.Ct. 2378. Our explanation was familiar: "We are interpreting and applying" not a judge-made doctrine but a "statutory requirement," and therefore must honor Congress's choice. *Ibid.* [1] All those precedents rebut the Court of Appeals' adoption of a "special circumstances" excuse for non-exhaustion.

**\*6** [7]  So too, the history of the PLRA underscores the mandatory nature of its exhaustion regime. Section § 1997e(a)'s precursor, enacted in the Civil Rights of Institutionalized Persons Act (CRIPA), § 7, 94 Stat. 352 (1980), was a "weak exhaustion provision." *Woodford,* 548 U.S., at 84, 126 S.Ct. 2378. Under CRIPA, a court would require exhaustion only if a State provided "plain, speedy, and effective" remedies meeting federal minimum standards—and even then, only if the court believed exhaustion "appropriate and in the interests of justice." § 7(a), 94 Stat. 352. That statutory scheme made exhaustion "in large part discretionary." *Nussle,* 534 U.S., at 523, 122 S.Ct. 983. And for that reason (among others), CRIPA proved inadequate to stem the then-rising tide of prisoner litigation. In enacting the PLRA, Congress thus substituted an "invigorated" exhaustion provision. *Woodford,* 548 U.S., at 84, 126 S.Ct. 2378. "[D]iffer[ing] markedly from its predecessor," the new § 1997e(a) removed the conditions that administrative remedies be "plain, speedy, and effective" and that they satisfy minimum standards. *Nussle,* 534 U.S., at 524, 122 S.Ct. 983. Still more, the PLRA prevented a court from deciding that exhaustion would be unjust or inappropriate in a given case. As described earlier, see *supra,* at —— – ——, all inmates must now exhaust all available remedies: "Exhaustion is no longer left to the discretion of the district court." *Woodford,* 548 U.S., at 85, 126 S.Ct. 2378.

[8]  The PLRA's history (just like its text) thus refutes a "special circumstances" exception to its rule of exhaustion. That approach, if applied broadly, would resurrect CRIPA's scheme, in which a court could look to all the particulars of a case to decide whether to excuse a failure to exhaust available remedies. But as we have observed, such wide-ranging discretion "is now a thing of the past." *Booth,* 532 U.S., at 739, 121 S.Ct. 1819. And the conflict with the PLRA's history (as again with its text) becomes scarcely less stark if the Fourth Circuit's exception is confined, as the court may have intended, to cases in which a prisoner makes a reasonable mistake about the meaning of a prison's grievance procedures. Understood that way, the exception reintroduces CRIPA's requirement that the remedial process be "plain"—that is, not subject to any reasonable misunderstanding or disagreement. § 7(a), 94 Stat. 352. When Congress amends legislation, courts must "presume it intends [the change] to have real and substantial effect." *Stone v. INS,* 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995). The Court of Appeals instead acted

as though the amendment—from a largely permissive to a mandatory exhaustion regime—had not taken place. [2]

## B

**\*7** **[9]** **[10]** Yet our rejection of the Fourth Circuit's "special circumstances" exception does not end this case—because the PLRA contains its own, textual exception to mandatory exhaustion. Under § 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones. And that limitation on an inmate's duty to exhaust —although significantly different from the "special circumstances" test or the old CRIPA standard—has real content. As we explained in *Booth,* the ordinary meaning of the word "available" is " 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.' " 532 U.S., at 737–738, 121 S.Ct. 1819 (quoting Webster's Third New International Dictionary 150 (1993)); see also Random House Dictionary of the English Language 142 (2d ed. 1987) ("suitable or ready for use"); 1 Oxford English Dictionary 812 (2d ed. 1989) ("capable of being made use of, at one's disposal, within one's reach"); Black's Law Dictionary 135 (6th ed. 1990) ("useable"; "present or ready for immediate use"). Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are "capable of use" to obtain "some relief for the action complained of." *Booth,* 532 U.S., at 738, 121 S.Ct. 1819.

To state that standard, of course, is just to begin; courts in this and other cases must apply it to the real-world workings of prison grievance systems. Building on our own and lower courts' decisions, we note as relevant here three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief. See Tr. of Oral Arg. 27–29 (Solicitor General as *amicus curiae* acknowledging these three kinds of unavailability). Given prisons' own incentives to maintain functioning remedial processes, we expect that these circumstances will not often arise. See *Woodford,* 548 U.S., at 102, 126 S.Ct. 2378. But when one (or more) does, an inmate's duty to exhaust "available" remedies does not come into play.

**[11]** **[12]** First, as *Booth* made clear, an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. See 532 U.S., at 736, 738, 121 S.Ct. 1819. Suppose, for example, that a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions. The procedure is not then "capable of use" for the pertinent purpose. In *Booth* 's words: "[S]ome redress for a wrong is presupposed by the statute's requirement" of an "available" remedy; "where the relevant administrative procedure lacks authority to provide any relief," the inmate has "nothing to exhaust." *Id.,* at 736, and n. 4, 121 S.Ct. 1819. So too if administrative officials have apparent authority, but decline ever to exercise it. Once again: "[T]he modifier 'available' requires the possibility of some relief." *Id.,* at 738, 121 S.Ct. 1819. When the facts on the ground demonstrate that no such potential exists, the inmate has no obligation to exhaust the remedy.

**\*8** **[13]** **[14]** **[15]** Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. As the Solicitor General put the point: When rules are "so confusing that ... no reasonable prisoner can use them," then "they're no longer available." Tr. of Oral Arg. 23. That is a significantly higher bar than CRIPA established or the Fourth Circuit suggested: The procedures need not be sufficiently "plain" as to preclude any reasonable mistake or debate with respect to their meaning. See § 7(a), 94 Stat. 352; 787 F.3d, at 698–699; *supra,* at ——, —— – ——. When an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion. But when a remedy is, in Judge Carnes's phrasing, essentially "unknowable"—so that no ordinary prisoner can make sense of what it demands—then it is also unavailable. See *Goebert v. Lee County,* 510 F.3d 1312, 1323 (C.A.11 2007); *Turner v. Burnside,* 541 F.3d 1077, 1084 (C.A.11 2008) ("Remedies that rational inmates cannot be expected to use are not capable of accomplishing their purposes and so are not available"). Accordingly, exhaustion is not required.

**[16]** And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. In *Woodford,* we recognized that officials might devise procedural systems (including the blind alleys and quagmires just discussed) in order to "trip[ ] up all but the most skillful prisoners." 548 U.S., at 102, 126 S.Ct. 2378. And appellate courts have addressed a variety of instances in which officials misled or threatened individual inmates so as to prevent their use of otherwise proper procedures. As all those courts have recognized, such interference with an inmate's pursuit of relief renders the administrative process unavailable. [3] And then, once again, § 1997e(a) poses no bar.

**[17]** The facts of this case raise questions about whether, given these principles, Blake had an "available" administrative remedy to exhaust. As explained earlier, Ross's exhaustion defense rests on Blake's failure to seek relief through Maryland's ARP process, which begins with a grievance to the warden and may continue with appeals to the Commissioner of Correction and the IGO. See *supra,* at —— – ——; Inmate Handbook, at 30–31. That process is the standard method for addressing inmate complaints in the State's prisons: The Inmate Handbook provides that prisoners may use the ARP for "all types" of grievances (subject to four exceptions not relevant here), including those relating to the use of force. *Id., at* ——; see App. 312. But recall that Maryland separately maintains the IIU to look into charges of staff misconduct in prisons, and the IIU did just that here. See *supra,* at ——. Blake urged in the courts below that once the IIU commences such an inquiry, a prisoner *cannot* obtain relief through the standard ARP process—whatever the Handbook may say to the contrary. See 787 F.3d, at 697; App. to Pet. for Cert. 38, 2012 WL 5568940, at *5. And in this Court, that issue has taken on new life. Both Blake and Ross (as represented by the Maryland attorney general) have lodged additional materials relating to the interaction between the IIU and the ARP. And *both* sides' submissions, although scattershot and in need of further review, lend some support to Blake's account—while also revealing Maryland's grievance process to have, at least at first blush, some bewildering features.

**\*9** Blake's filings include many administrative dispositions (gleaned from the records of other prisoner suits) indicating that Maryland wardens routinely dismiss ARP grievances as procedurally improper when parallel IIU investigations are pending. One warden, for example, wrote in response to a prisoner's complaint: "Your Request for Administrative Remedy has been received and is hereby dismissed. This issue has been assigned to the Division of Correction's Internal Investigative Unit (Case # 07–35–010621I/C), and will no longer be addressed through this process." Lodging of Respondent 1; see also, *e.g., id.,* at 18 ("Admin. Dismiss Final: This is being investigated outside of the ARP process by I.I.U."). In addition, Blake has submitted briefs of the Maryland attorney general (again, drawn from former prisoner suits) specifically recognizing that administrative practice. As the attorney general stated in one case: "Wilkerson filed an ARP request," but "his complaint already was being investigated by the [IIU], superceding an ARP investigation." *Id.,* at 23–24; see also, *e.g., id.,* at 5 (Bacon's grievance "was dismissed because the issue had been assigned to [the] IIU and would no longer be addressed through the ARP process"). [4]

And Ross's own submissions offer some confirmation of Blake's view. Ross does not identify a single case in which a warden considered the merits of an ARP grievance while an IIU inquiry was underway. See Tr. of Oral Arg. 6 (Maryland attorney general's office conceding that it had found none). To the contrary, his lodging contains still further evidence that wardens consistently dismiss such complaints as misdirected. See, *e.g.,* Lodging of Petitioner 15 (District Court noting that "Gladhill was advised that no further action would be taken through the ARP process because the matter had been referred to the [IIU]"). Indeed, Ross' materials suggest that some wardens use a rubber stamp specially devised for that purpose; the inmate, that is, receives a reply stamped with the legend: "Dismissed for procedural reasons.... This issue is being investigated by IIU case number: ____. No further action shall be taken within the ARP process." *Id.,* at 25, 32, 38; see Tr. of Oral Arg. 8–9 (Maryland attorney general's office conceding the stamp's existence and use).

**\*10** Complicating the picture, however, are several cases in which an inmate refused to take a warden's jurisdictional "no" for an answer, resubmitted his grievance up the chain to the IGO, and there received a ruling on the merits, without any discussion of the ARP/IIU issue. We confess to finding these few cases perplexing in relation to normal appellate procedure. See *id.,* at 3–10, 13–15, 18–20 (multiple Justices expressing confusion about Maryland's procedures). If the IGO thinks the

wardens wrong to dismiss complaints because of pending IIU investigations, why does it not say so and stop the practice? Conversely, if the IGO thinks the wardens right, how can it then issue merits decisions? And if that really is Maryland's procedure—that when an IIU investigation is underway, the warden (and Commissioner of Correction) cannot consider a prisoner's complaint, but the IGO can —why does the Inmate Handbook not spell this out? Are there, instead, other materials provided to prisoners that communicate how this seemingly unusual process works and how to navigate it so as to get a claim heard?

In light of all these lodgings and the questions they raise about Maryland's grievance process, we remand this case for further consideration of whether Blake had "available" remedies to exhaust. The materials we have seen are not conclusive; they may not represent the complete universe of relevant documents, and few have been analyzed in the courts below. On remand, in addition to considering any other arguments still alive in this case, the court must perform a thorough review of such materials, and then address the legal issues we have highlighted concerning the availability of administrative remedies. First, did Maryland's standard grievance procedures potentially offer relief to Blake or, alternatively, did the IIU investigation into his assault foreclose that possibility? Second, even if the former, were those procedures knowable by an ordinary prisoner in Blake's situation, or was the system so confusing that no such inmate could make use of it? And finally, is there persuasive evidence that Maryland officials thwarted the effective invocation of the administrative process through threats, game-playing, or misrepresentations, either on a system-wide basis or in the individual case? If the court accepts Blake's probable arguments on one or more of these scores, then it should find (consistent this time with the PLRA) that his suit may proceed even though he did not file an ARP complaint.

III

**\*11  [18]**  Courts may not engraft an unwritten "special circumstances" exception onto the PLRA's exhaustion requirement. The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are "available." On remand, the court below must consider how that modifying term affects Blake's case—that is, whether the remedies he

failed to exhaust were "available" under the principles set out here. We therefore vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice THOMAS, concurring in part and concurring in the judgment.

I join the Court's opinion except for the discussion of Maryland's prison-grievance procedures, *ante,* at —— – ——, which needlessly wades into respondent Shaidon Blake's questionable lodgings of new documents in this Court. Those documents are not part of the appellate record. See Fed. Rule App. Proc. 10(a). We have "consistently condemned" attempts to influence our decisions by submitting "additional or different evidence that is not part of the certified record." S. Shapiro, K. Geller, T. Bishop, E. Hartnett, & D. Himmelfarb, Supreme Court Practice § 13.11(k), p. 743 (10th ed. 2013). Perhaps Blake's newfound documents are subject to judicial notice as public records. See Fed. Rule Evid. 201. But I would not take such notice for the first time in this Court. It appears that Blake had a chance to submit many of his documents to the lower courts and failed to do so. Taking notice of the documents encourages gamesmanship and frustrates our review. I would let the Court of Appeals decide on remand whether to supplement the record, see Fed. Rule App. Proc. 10(e), or take notice of Blake's lodgings.

Justice BREYER, concurring in part.

I join the opinion of the Court, with the exception that I described in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). There, I agreed that "Congress intended the term 'exhausted' to 'mean what the term means in administrative law, where exhaustion means proper exhaustion.' " *Id.,* at 103, 126 S.Ct. 2378 (opinion concurring in judgment). Though that statutory term does not encompass "freewheeling" exceptions for any " 'special circumstanc[e],' " *ante,* at ——, it does include administrative law's "well-established exceptions to exhaustion." *Woodford, supra,* at 103, 126 S.Ct. 2378 (opinion of BREYER, J.). I believe that such exceptions, though not necessary to the Court's disposition of this case, may nevertheless apply where appropriate.

**All Citations**

--- S.Ct. ----, 2016 WL 3128839, 14 Cal. Daily Op. Serv.
5801, 26 Fla. L. Weekly Fed. S 205

Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1    We note that our adherence to the PLRA's text runs both ways: The same principle applies regardless of whether it benefits the inmate or the prison. We have thus overturned judicial rulings that imposed extra-statutory limitations on a prisoner's capacity to sue—reversing, for example, decisions that required an inmate to demonstrate exhaustion in his complaint, permitted suit against only defendants named in the administrative grievance, and dismissed an entire action because of a single unexhausted claim. See *Jones v. Bock,* 549 U.S. 199, 203, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). "[T]hese rules," we explained, "are not required by the PLRA," and "crafting and imposing them exceeds the proper limits on the judicial role." *Ibid.*

2    Of course, an exhaustion provision with a different text and history from § 1997e(a) might be best read to give judges the leeway to create exceptions or to itself incorporate standard administrative-law exceptions. See 2 R. Pierce, Administrative Law Treatise § 15.3, p. 1245 (5th ed. 2010). The question in all cases is one of statutory construction, which must be resolved using ordinary interpretive techniques.

3    See, *e.g., Davis v. Hernandez,* 798 F.3d 290, 295 (C.A.5 2015) ("Grievance procedures are unavailable ... if the correctional facility's staff misled the inmate as to the existence or rules of the grievance process so as to cause the inmate to fail to exhaust such process" (emphasis deleted)); *Schultz v. Pugh,* 728 F.3d 619, 620 (C.A.7 2013) ("A remedy is not available, therefore, to a prisoner prevented by threats or other intimidation by prison personnel from seeking an administrative remedy"); *Pavey v. Conley,* 663 F.3d 899, 906 (C.A.7 2011) ("[I]f prison officials misled [a prisoner] into thinking that ... he had done all he needed to initiate the grievance process," then "[a]n administrative remedy is not 'available' "); *Tuckel v. Grover,* 660 F.3d 1249, 1252–1253 (C.A.10 2011) ("[W]hen a prison official inhibits an inmate from utilizing an administrative process through threats or intimidation, that process can no longer be said to be 'available' "); *Goebert v. Lee County,* 510 F.3d 1312, 1323 (C.A.11 2007) (If a prison "play[s] hide-and-seek with administrative remedies," then they are not "available").

4    Blake further notes that in 2008, a year after his beating, Maryland amended one of its prison directives to state expressly that when the IIU investigates an incident, an ARP grievance may not proceed. See App. 367, Md. Div. of Correction, Directive 185–003, § VI(N)(4) (Aug. 27, 2008) (The Warden "shall issue a final dismissal of [an ARP] request for procedural reasons when it has been determined that the basis of the complaint is the same basis of an investigation under the authority of the [IIU]"); Brief for Respondent 17–18. According to Blake, that amendment merely codified what his submissions show had long been the practice in Maryland prisons. See *ibid.*

---

**End of Document**        © 2016 Thomson Reuters. No claim to original U.S. Government Works.